## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## AT ATLANTA

**MICHAEL E. BROHM,**

      **Plaintiff,**

**v.**                            **CIVIL ACTION NO.**

**NAUTIC PARTNERS, LLC,**
**SCOTT HILINSKI,**
**KENNETH McGEE, and**
**CHESTER CROUCH,**

      **Defendants.**

## COMPLAINT

### Parties, Jurisdiction, and Venue

1. Plaintiff Michael E. Brohm is and was at all times relevant to this action a citizen and resident of Norcross, Gwinnett County, Georgia.

2. Defendant Nautic Partners, LLC is a limited-liability company formed in Delaware and with its principal place of business in Rhode Island and not authorized to do business in Georgia.

3. Defendant Scott Hilinski is and was at all times relevant to this action a citizen and resident of Massachusetts.

4.    Defendant Kenneth McGee is and was at all times relevant to this action a citizen and resident of Texas.

5.    Defendant Chester Crouch is and was at all times relevant to this action a citizen and resident of Texas.

6.    Jurisdiction is proper with this Court under 28 U.S.C. § 1332(a).

7.    Venue is proper with this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the action occurred in this judicial district.

## Facts

### Michael Brohm's background and experience

8.    Plaintiff Michael E. Brohm is an experienced healthcare operations and finance executive with more than 30 years' experience in several sectors of the healthcare-services industry.

9.    From 2003 until the fall of 2007, Brohm served as the chief operating officer for Regency Hospital Company, which was based in Atlanta, Georgia and operated 23 long-term acute-care hospitals ("LTACH") in nine states before it was sold to Select Medical Corporation.

10.    During the fall of 2007, when Regency Hospital Company was for sale, Brohm pursued a new position as chief executive officer of another LTACH company, Cornerstone Healthcare Group, which consisted of 11 LTAC hospitals in five states.

11.    Cornerstone was owned by J.W. Childs Associates, a private equity company, and was in financial trouble, which presented Brohm with an opportunity to lead a troubled company through an operational and financial turnaround.

12.    Highland Capital Management, L.P., which manages investment funds that acquire the debt of distressed companies, was able to obtain ownership of Cornerstone because two of the funds Highland manages owned most of Cornerstone's debt, and Cornerstone could not meet its obligations

13.     On October 1, 2007, Highland acquired Cornerstone from J.W. Childs for approximately $80 million, consisting of $62 million in outstanding debt and $18 million in equity.

14.    Brohm had spoken initially to J.W. Childs management about joining Cornerstone, and then performed consulting work for Highland in its evaluation of whether to acquire Cornerstone. On October 1, 2007, when Highland acquired Cornerstone, Brohm joined Cornerstone as its chief executive officer and a member of its board of directors.

3

15. Brohm proceeded to recruit Defendant Kenneth McGee, whom Brohm met when McGee was chief executive officer of two LTAC hospitals operated by Select Medical in Dallas, Texas, to serve as vice-president of operations and Patrick Ryan as vice-president of marketing.

16. Under Brohm's leadership, Cornerstone went from a loss of $500,000 in 2007 to profits of $14.5 million in 2008 and $27 million in 2009.

17. In August 2010, Cornerstone acquired seven LTAC hospitals from Solara Healthcare, which resulted in an increase in Cornerstone's annualized profits to more than $40 million and caused Cornerstone's equity value to reach $290 million, an increase of $272 million in the three years since Highland acquired Cornerstone for $18 million in equity.

18. Over the same three-year period that Brohm's leadership produced a 15-fold increase in Cornerstone's equity value, Cornerstone repeatedly delayed completing employment and equity-participation agreements with Brohm, McGee, and others, even though Cornerstone had agreed to complete those agreements within the executives' first 90 days of employment.

19. Ultimately Cornerstone approved the employment and equity-participation agreements for Brohm, McGee, and others, but the agreements did not include terms that were standard for healthcare executives and were so one-sided in

favor of Cornerstone that Brohm concluded that he could not sign the agreements, as they would allow Cornerstone to decrease the equity value created by his leadership.

20.     During this same time, Brohm, McGee, and others became concerned with certain unethical and potentially illegal actions taken by Cornerstone's board of directors, which financially benefited Highland to the detriment of Cornerstone's equity stakeholders.

21.     While Brohm served as Cornerstone's CEO, he maintained his permanent residence in suburban Atlanta, Georgia, as he and Cornerstone's board of directors had agreed that he would not move permanently to Dallas, Texas, where Cornerstone's headquarters were located, until his employment and equity-participation agreements were completed and executed, and that Cornerstone would pay for his temporary residence in Dallas and his weekly travel back and forth to Atlanta.

22.     Also, while Brohm served as Cornerstone's CEO, McGee introduced him to Defendant Chester Crouch, who was chief operating officer of Reliant Hospital Partners, which operated seven in-patient rehabilitation hospitals.

23.     Crouch and McGee informed Brohm that Reliant was having difficulty raising capital to fund its growth strategy but was not for sale (no one from Reliant

ever approached Brohm about its sale or purchase, although Reliant's owner and Crouch had been seeking investment partners).

24. In mid to late 2010, an executive recruiter contacted Brohm about serving as chief executive officer of RehabCare Group, a large, multi-location in-patient rehabilitation hospital company. Brohm researched the industry extensively and saw an opportunity for an operator to develop freestanding rehabilitation hospitals.

25. Because of the three-year delay in finalizing his employment and equity-participation agreements and the unilateral changes Cornerstone made to those agreements, including an ability to terminate him at any time without cause, Brohm concluded that Cornerstone did not intend to fulfill the commitments it had made to him and upon which he had relied in accepting the position as CEO, and decided to leave Cornerstone.

26. Brohm did not make this decision lightly, as he left behind $300,000 in unpaid performance bonuses earned in 2010 that were due to be paid in August 2011 and February 2012. Had Cornerstone finalized Brohm's equity-participation agreement as it had committed to do when it hired him, he would have met the three-year vesting period and owned 4.5% of Cornerstone, which would have been worth approximately $13.5 million.

6

27.    Although RehabCare had not offered the CEO position to Brohm, he was encouraged by the opportunities he found in the in-patient rehabilitation hospital industry and decided to find a private-equity company that would consider investing in his strategy to develop freestanding rehabilitation hospitals.

**Brohm's involvement with Nautic**

28.    Brohm talked with several private-equity groups that invest in healthcare-services companies about his proposal and eventually approached Defendant Nautic Partners, LLC, through Defendant Scott Hilinski, in November 2010.

29.    Hilinski was and remains a managing director of Nautic, a middle-market private equity firm that makes investments in and concentrates on the healthcare industry.

30.    Brohm proposed to Hilinski that Nautic approach Reliant for a potential acquisition, hire Brohm (as CEO), McGee, and Ryan, and implement Brohm's strategy of opening and acquiring in-patient rehabilitation hospitals.

31.    Hilinski was very interested as long as Nautic could hire Brohm, McGee, and Ryan to lead the company, based on the results they had obtained at Cornerstone and that Brohm had achieved before that at Regency.

7

32.   During the interview process, Hilinski asked Brohm to provide a written report about how he and his team had been able to achieve such impressive operational and financial improvements at Cornerstone. Brohm provided this information to Hilinski (which would later lead to an unfounded accusation that Brohm had improperly shared Cornerstone's confidential information with Nautic).

33.   As part of the preliminary discussions between Brohm and Nautic, Hilinski coordinated a call among Brohm, Nautic, and Nautic's counsel, Steve Cowley of Edwards Wildman Palmer LLP, to determine whether Nautic faced any legal exposure in hiring Brohm, McGee, and Ryan, considering Highland's reputation for litigiousness.

34.   Based on the call, Nautic determined that Brohm, McGee, and Ryan did not have any contractual obligations or restrictions that prevented them from leaving Cornerstone to lead this new venture and agreed with the strategy Brohm had proposed. Nautic, through Hilinski, advised Brohm that Nautic would move forward with Brohm and his team to acquire Reliant.

35.   Brohm introduced Nautic to Reliant's owner in late 2010. In early 2011, Nautic negotiated a purchase price and executed a letter of intent to acquire Reliant. Nautic engaged third parties to perform due diligence on Reliant,

8

while Brohm provided advice on that process and completed a formal business plan, which he presented at a meeting of Nautic's investment committee in March 2011, which McGee and Ryan also attended.

### Brohm's employment with and investment in Reliant

36.  Brohm, McGee, and Ryan negotiated and executed employment and equity-participation agreements in March 2011. Because Hilinski strongly insisted that Nautic's portfolio executives "stretch" their personal finances to demonstrate their commitment to the Reliant strategy, Brohm invested $400,000 of his personal savings, while McGee invested $100,000, and Ryan $60,000. Nautic then hired Brohm as Reliant's CEO and chairman of its board of directors, McGee as its COO, and Ryan as its executive vice-president of marketing and provider relations.

37.  For his investment, Brohm received 400,000 Class A Units in an entity named Reliant Holding Company, LLC and referred to as "New Reliant." Nautic then issued Brohm Class B Units ("Founder's Shares") equal to his initial cash investment in Class A Units.

38.  Nautic had made clear that it would not close on the Reliant acquisition unless Brohm, McGee, and Ryan agreed to join Reliant to implement Brohm's

business plan. Consequently, Nautic required Brohm, McGee, and Ryan to resign from and leave Cornerstone on the same day Nautic closed on the Reliant acquisition and simultaneously to execute their employment and equity-participation agreements with Reliant, as Nautic feared that Cornerstone would attempt to counter Nautic's offer and even complete its employment and equity-participation agreements with Brohm, McGee, and Ryan as a means of retaining them.

39.   On March 23, 2011, Nautic closed on its acquisition of Reliant, and Brohm, McGee, and Ryan simultaneously resigned from Cornerstone and were hired by Reliant that same day.

40.   Within two weeks of Nautic closing on its acquisition of Reliant and Brohm, McGee, and Ryan joining Reliant, Cornerstone sued Nautic, Reliant, Brohm, McGee, and Ryan, alleging, among other things, that Brohm breached his fiduciary duty to Cornerstone and conspired with Nautic to deprive Cornerstone of an opportunity to acquire Reliant. Cornerstone later added other defendants, including Hilinski.

41.   Just three weeks after Brohm, McGee, and Ryan joined Reliant, they, along with two employees hired from Cornerstone's finance department Chad

Deardorff and Jerry Huggler, were placed on administrative leave and, except for McGee, never returned to work for Reliant.

42. On June 30, 2011, just three months after joining Reliant as its CEO, Reliant terminated Brohm, as well as Ryan, Deardorff, and Huggler, for unspecified reasons. Nautic retained McGee and Crouch, who had worked for Reliant before Nautic acquired it.

43. Nautic proposed an agreement to terminate Brohm's employment, which included the payment of Brohm's salary and health insurance benefits through September 30, 2011 and predetermined legal fees to David Watkins of Jenkins and Watkins, PC, whom Nautic had retained to represent Brohm. Brohm consulted with Watkins and McGee about the offer because he believed he could rely on their advice. The agreement did not address Brohm's investment in the Reliant deal.

44. Following his termination, Brohm did not have access to any information from Reliant or about its financial condition. McGee remained in contact with Brohm by making secret phone calls using a "burner" cell phone with an Atlanta area code over a five-year period. McGee represented to Brohm that he was looking out for Brohm's best interests, but McGee was actually deceiving Brohm by providing him with selective information, usually

inaccurate or slanted in Reliant's favor, or asking what Brohm knew or had heard about the lawsuit, and his cell phone calls to Brohm were part of the Defendants' plan and strategy to deceive Brohm.

45.   Because of his numerous and lengthy telephone conversations with Brohm, McGee knew that Brohm was having trouble finding employment because prospective employers were aware of Highland's reputation for litigiousness and were concerned that hiring Brohm could subject them to litigation. And because of his inability to find long-term employment, combined with the $400,000 in personal savings that he had invested in the Reliant deal at Nautic's insistence, Brohm was not able to pay for legal representation.

### Defendants do not make Brohm aware of the Reliant recapitalization or HealthSouth sale

46.   At some point in 2014, McGee was or became aware that Reliant was planning to return Brohm's $400,000 investment—more than three years after Reliant had terminated Brohm. What McGee did not tell Brohm, who did not otherwise know, was that Reliant was planning to recapitalize—issue debt to pay dividends to equity holders—after it repaid Brohm, which would greatly increase the value of the remaining equity holders' investments.

47.   In order to exert more pressure on Brohm to execute an agreement that benefited Defendants, i.e., ensure that Brohm's investment in Class A Units was repurchased before the recapitalization occurred so that he could not participate, Reliant, though a letter from Crouch, offered to repay Brohm's investment balance at an amount that was intentionally less than what he was owed on his investment.

48.   On August 18, 2014, Reliant agreed to repurchase Brohm's Class A Units for $318,428.59, which was Brohm's purchase price of $400,000 less $81,571.41 distributed to Brohm on December 31, 2013 as a return of capital, but which did not include any accumulated earnings. The agreement provided that upon Reliant's repurchase, Brohm would no longer have any interest in the Class A Units he had purchased—and obviously no right to participate in the recapitalization, which was not disclosed to Brohm, even though he was an equity holder.

49.   Because Brohm disputed that Reliant had fully compensated him for the accumulated value of his Class A Units, on September 14, 2014, Reliant agreed to pay Brohm an additional $129,296, with no disclosure of the recapitalization, which was imminent.

50.   None of the Defendants ever informed Brohm about the recapitalization or gave him the opportunity to retain his Class A Units to share in the recapitalization; if Brohm had known about the recapitalization, he would not have agreed to Reliant's repurchase of his Class A Units.

51.   As a result of the recapitalization in 2014, which occurred after Reliant had repurchased Brohm's Class A Units without informing him that the recapitalization was imminent, Nautic received an additional $172.2 million, McGee an additional $4.9 million, and Crouch an additional $4.8 million. Brohm did not receive any dividend because Defendants had already deceived him into agreeing to Reliant's repurchase of his shares.

52.   The recapitalization would have caused Brohm's 400,000 Class A Units to be worth $19,626,516, rather than the $529,296 that he had been deceived into accepting.

53.   On October 1, 2015, HealthSouth Corporation acquired Reliant from Nautic for $730 million. After deductions for outstanding debt and other expenses, $567.4 million was available for distribution to Reliant's investors. Nautic, which initially invested approximately $45 million to acquire Reliant, received over $465 million, more than ten times its original investment. Other Class A Unit investors, including McGee, Crouch, and Ryan, also received

returns of more than ten times their original investments. Even though Reliant terminated Ryan at the same time as Brohm, it did not elect to repurchase his Class A Units, which allowed Ryan to participate in the proceeds from the sale to HealthSouth. Based on Brohm's ownership of 400,000 Class A Units, he would have received $4 million from the sale.

54.     Brohm and McGee had initially been issued Class B Units ("Founder's Shares"). After the sale to HealthSouth, Brohm's Class B Units would have been worth $4 million. Certain executives and outside board members, including Brohm, were also issued stock options in the form of Class C Units. Brohm was granted 7.75% of Class C Units, which would have been worth $44.47 million after the sale to HealthSouth. Once Reliant repurchased Brohm's Class A Units, however, his Class B and C Units ceased to exist, which deprived him of the value of the Class B and C Units after the sale to HealthSouth.

55.     HealthSouth was willing to pay such a high price for Reliant—resulting in spectacular returns for Reliant's investors—because Reliant had achieved superior financial results by implementing Brohm's business strategy, which made Reliant attractive to HealthSouth.

56.   From Reliant's equity recapitalization and its sale to HealthSouth, Nautic received $637.3 million, Crouch received $34.7 million, and McGee received $34.1 million. Brohm received nothing.

## Count I
## Fraud

57.   Brohm incorporates paragraphs 1 through 56 by reference hereto as if set forth verbatim hereinafter.

58.   Defendants, as directors, officers, and controlling shareholders, had access to and were aware of information, including the Reliant recapitalization and sale to HealthSouth, that Brohm, as a shareholder, did not and could not have access to or know.

59.   Armed with this information, Defendants repeatedly, consistently, and intentionally deceived Brohm by waiting to repurchase his Class A Units until he had no choice but to agree to sell them, and then intentionally offering him less than the accumulated value of his Class A Units and failing to inform him or otherwise make him aware of Reliant's recapitalization and sale to Health South.

60. Brohm's knowledge of either Reliant's recapitalization or its sale to HealthSouth or both would have caused him not to agree to Reliant's repurchase of his Class A Units.

61. Defendants deceived and defrauded Brohm when they created pressure on him to sell his Class A Units by waiting so long to repurchase them, by intentionally offering him less than the accumulated value of his Class A Units, and by failing to inform him or otherwise make him aware of Reliant's recapitalization and the sale to HealthSouth.

62. Defendants intended to deceive and defraud Brohm by causing him to act or refrain from acting.

63. Defendants' fraudulent and deceitful actions caused Brohm to agree to Reliant's repurchase of his Class A Units rather than to retain his interest so that he could participate in the recapitalization and sale to HealthSouth.

64. As a direct and proximate result of Defendants' fraudulent and deceitful actions, Brohm has been harmed and sustained damages.

65. In engaging in this conduct, Defendants acted with malice, recklessness, malice, and wantonness, which justifies an award of punitive damages to Brohm.

**Count II**
**Breach of Fiduciary Duty**

66    Brohm incorporates paragraphs 1 through 65 by reference hereto as if set forth verbatim hereinafter.

67.    Defendants, as directors, officers, and controlling shareholders, owed fiduciary duties to Brohm, as a shareholder, at all times.

68.    These duties included, but were not limited to, a duty of loyalty, a duty of full disclosure, a duty to act fairly, and a duty of good faith and fair dealing.

69.    The existence of these duties required Defendants to inform Brohm of Reliant's recapitalization, which would have substantially increased the value of his Class A Units—which he would not have agreed to sell to Reliant prior to the recapitalization.

70.    The existence of these duties required Defendants to inform Brohm of Reliant's sale to HealthSouth, which would have substantially increased the value of his Class A Units—which he would not have agreed to sell to Reliant prior to the sale to HealthSouth.

71.    Defendants failed to inform Brohm or make him aware in any way of Reliant's recapitalization.

72.    Defendants failed to inform Brohm or make him aware in any way of Reliant's sale to HealthSouth.

18

73.   Defendants breached their fiduciary duties to Brohm by failing to inform Brohm or make him aware in any way of Reliant's recapitalization.

74.   Defendants breached their fiduciary duties to Brohm by failing to inform Brohm or make him aware in any way of Reliant's sale to HealthSouth.

75.   As a direct and proximate result of Defendants' breach of their fiduciary duties, Brohm has been harmed and sustained damages.

76.   In engaging in this conduct, Defendants acted with malice, recklessness, malice, and wantonness, which justifies an award of punitive damages to Brohm.

**Count III**
**Intentional Infliction of Emotional Distress**

77.   Brohm incorporates paragraphs 1 through 76 by reference hereto as if set forth verbatim hereinafter.

78.   Defendants engaged in intentional or reckless conduct against Brohm, which is described in this complaint.

79.   Defendants' conduct was extreme and outrageous and intended to harm Brohm.

80.   Defendants' conduct caused Brohm to suffer and experience emotional distress, which was severe.

19

81.   As a direct and proximate result of Defendants' actions in intentionally inflicting emotional distress, Brohm has been harmed and sustained damages.

82.   In engaging in this conduct, Defendants acted with malice, recklessness, malice, and wantonness, which justifies an award of punitive damages to Brohm.


**WHEREFORE**, Plaintiff Michael E. Brohm prays that this Honorable Court enter judgment on his behalf against Defendants Nautic Partners, LLC, Scott Hilinski, Kenneth McGee, and Chester Crouch, jointly and severally, in an amount which will adequately compensate him for his losses; punitive damages in an amount to be determined by a jury; pre- and post-judgment interest; attorney's fees and expenses; court costs; and any other relief this Court deems just and proper.

### <u>DEMAND FOR JURY TRIAL</u>

Plaintiff Michael E. Brohm demands a trial by jury.

**MICHAEL E. BROHM**
**By Counsel**


/s/ E. Talley Gray
E. Talley Gray (GA Bar No. 533660)
3449 Lawrenceville-Suwanee Road, Suite E
Suwanee, GA 30024
(678) 428-4868
talleygray@gmail.com


/s/ Jeffrey V. Mehalic
Jeffrey V. Mehalic (To be admitted *pro hac vice*)
Law Offices of Jeffrey V. Mehalic
364 Patteson Drive, No. 228
Morgantown, WV 26505-3202
(304) 346-3462
jeff@mehaliclaw.com

*Counsel for Plaintiff Michael E. Brohm*